Lauren M. Rule (OSB # 015174)
Andrew R. Missel (OSB # 181793)
Hannah A. Goldblatt (OSB # 205324)
ADVOCATES FOR THE WEST
3701 SE Milwaukie Ave., Ste. B
Portland, OR 97202
(503) 914-6388
lrule@advocateswest.org
amissel@advocateswest.org
hgoldblatt@advocateswest.org

Daniel C. Snyder (OSB # 105127)
Haley Nicholson (OSB # 224615)
PUBLIC JUSTICE
620 L Street NW, Ste 630
Washington, DC 20036
(202) 797-8600
dsnyder@publicjustice.net
hnicholson@publicjustice.net

Peter D. Jensen III (OSB # 235260)
CASCADIA WILDLANDS
120 Shelton McMurphy Blvd., Ste. 250
Eugene, Oregon 97440
(541) 434-1463
peter@cascwild.org

Lindsey Hutchison (OSB # 214690)
WILLAMETTE RIVERKEEPER
454 Willamette Street, #218
Eugene, OR 97401
(831) 818-4129
lindsey@willametteriverkeeper.org

*Attorneys for the Plaintiffs*

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

### EUGENE DIVISION

| | |
|---|---|
| **CASCADIA WILDLANDS; WILLAMETTE RIVERKEEPER; OREGON WILD; and NATIVE FISH SOCIETY,** | **Case No.: 6:25-cv-446** |
| Plaintiffs, | |
| v. | **COMPLAINT** |
| **EUGENE WATER & ELECTRIC BOARD,** | |
| Defendant. | |

**INTRODUCTION**

1.      Plaintiffs Cascadia Wildlands, Willamette Riverkeeper, Oregon Wild, and Native Fish Society, on behalf of themselves, their members, and supporters, challenge Eugene Water & Electric Board's ("EWEB") past and ongoing violations of the Endangered Species Act ("ESA"). EWEB's continued operation and maintenance of the Carmen-Smith Hydroelectric Project ("Carmen-Smith Project" or "Project") has and will continue to cause unlawful "take" of threatened Upper Willamette River Chinook salmon and bull trout.

2.      The Trail Bridge Dam is within the Carmen-Smith Project and blocks access to critical spawning habitat, isolates a population of bull trout, and otherwise impairs these species' behaviors and migratory patterns. Yet, to date, EWEB has failed to implement effective fish passage measures, despite legal requirements to do so under the Federal Power Act, Clean Water Act, and ESA. This failure has caused and is continuing to cause unlawful "take" of both species in violation of Section 9 of the ESA.

3.      The Carmen-Smith Project is a series of three dams, three reservoirs, and two powerhouses located in the upper reach of the McKenzie River. It is owned and operated by EWEB for hydropower production, which began after its construction in 1963. The Trail Bridge Dam is the lowermost dam in the Project and stands as an absolute barrier to fish migration above and below the dam. This entirely isolates a local population of bull trout above the dam, harming the trout by inhibiting normal migratory and breeding behaviors and preventing genetic exchange between populations. It also harms Upper Willamette River Chinook salmon by disrupting the species' normal behavior patterns for breeding. Not a single salmon can presently access critical spawning habitat above the dam without human intervention. Lacking any up- or downstream fish passage infrastructure, fish moving upriver must be collected via a trap or hook and line and transported by truck ("trap-and-haul") to get above the dam, and fish migrating downriver must go through the dam's dangerous spillway and turbines, resulting in significant injury and mortality to adult and juvenile fish.

4.      In 2006, EWEB began the process of renewing its license for the Carmen-Smith Project. Initially, EWEB committed to providing volitional fish passage at Trail Bridge Dam by constructing a "fish ladder" for upstream passage, and a fish screen and bypass system for downstream passage. Volitional fish passage means that fish are able to swim around barriers on their own volition, without human intervention that itself can harm, harass, injure, and kill fish. Eight years later, EWEB abandoned its obligation for volitional fish passage due to cost and proposed instead to install a trap-and-haul facility and modify the dam's spillway for up- and downriver migration on an expedited three-year timeline.

5.      The National Marine Fisheries Service ("NMFS") and the U.S. Fish and Wildlife Service ("FWS") reluctantly accepted this compromise in 2018 Biological Opinions, concluding that *if* EWEB implemented the new fish passage measures on time, the Project would not jeopardize the continued existence of the species or result in the destruction or adverse modification of their critical habitats. Their opinions allowed for limited incidental "take" of the fish that depended on EWEB completing fish passage facilities and other conservation measures by the proposed three-year timeline. In 2019, the Federal Energy Regulatory Commission ("FERC") issued EWEB's new license for the Carmen-Smith Project, incorporating these measures and affirmatively obligating EWEB to complete up- and downstream fish passage facilities at Trail Bridge Dam by May 17, 2022.

6.      EWEB violated the May 2022 deadline to complete fish passage measures at Trail Bridge Dam. In fact, EWEB failed to even initiate construction. It ignored its commitments despite condemnation from FERC, NMFS, FWS, and the conservation community, including Plaintiffs here. EWEB's delays are so egregious that in 2023 and 2024, NMFS and FWS notified FERC that EWEB was not in compliance with their 2018 Biological Opinions and associated Incidental Take Statements, triggering the need to re-analyze the Project. EWEB's non-compliance with the May 2022 deadline also violated the terms and conditions of the 2018 Incidental Take Statements and EWEB has exceeded the level of authorized take. Its "take" of

threatened Chinook salmon and bull trout is thus no longer protected and EWEB is liable under ESA Section 9.

7.     EWEB's failure to abide by its legal commitments has and continues to result in significant harm, harassment, injury, and mortality to threatened Upper Willamette River Chinook salmon and bull trout at the Carmen-Smith Project, in violation of ESA Section 9. The lack of safe up- and downstream fish passage at Trail Bridge Dam disrupts Chinook and bull trout normal behavioral patterns and causes harm, injury, and mortality to the fish. EWEB's temporary trap-and-haul also causes harm, harassment, injury, and mortality. Without long-term fish passage, EWEB's operation and maintenance of the Carmen-Smith Project contributes to the decline of these already extremely at-risk populations. EWEB will continue these unlawful actions absent declaratory and injunctive relief from this Court.

## JURISDICTION AND VENUE

8.     Jurisdiction is proper in this Court pursuant to the ESA citizen suit provision, 16 U.S.C. § 1540(g), because this action seeks to enjoin Defendant from further violations of the Act and regulations promulgated thereunder. Jurisdiction is also proper under 28 U.S.C. § 1331 because this action arises under the laws of the United States, including the ESA, 16 U.S.C. § 1531 *et seq*., and the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*. An actual, justiciable controversy exists between the parties, and the requested relief is therefore proper under 16 U.S.C. § 1540(g) and 28 U.S.C. §§ 2201–02.

9.     Venue is proper in this Court under 16 U.S.C. § 1540(g)(3)(A) and 28 U.S.C. § 1391 because the violations and the resources at issue occur in this judicial district, and at least one Plaintiff resides in this district. Venue is proper in the Eugene Division of this district because a substantial portion of the lands and resources at issue occur in this division and three Plaintiffs and the Defendant have offices in this division. LR 3-2(b).

10.    As required by the ESA, on January 8, 2025, Plaintiffs provided Defendant EWEB notice of their intent to bring this action more than 60 days prior to filing this lawsuit. This notice was provided by certified mail and email to EWEB officials. Notice was also

provided by certified mail to the Secretary of the Interior and the Secretary of Commerce. No government entity has brought an ESA Section 9 case against EWEB for the violations complained of herein.

## PARTIES

### Plaintiffs

11.     Plaintiff **Cascadia Wildlands** is a non-profit organization headquartered in Eugene, Oregon, with approximately 12,000 members and supporters throughout the United States. Cascadia Wildlands educates, agitates, and inspires a movement to protect and restore wild ecosystems in the Cascadia Bioregion, extending from Northern California into Alaska. Cascadia Wildlands envisions vast old-growth forests, rivers full of salmon, wolves howling in the backcountry, and vibrant communities sustained by the unique landscapes of the Cascadia Bioregion.

12.     Plaintiff **Willamette Riverkeeper** is a non-profit organization founded in 1996 and headquartered in Portland, Oregon with a satellite office in Eugene. Willamette Riverkeeper has thousands of members in Oregon and the Pacific Northwest. Willamette Riverkeeper focuses on protecting and restoring the resources of the Willamette River Basin in Oregon and works on programs and projects ranging from Clean Water Act compliance and river education to Superfund cleanup and restoring habitat.

13.     Plaintiff **Oregon Wild** is a non-profit conservation organization founded in 1974 with the mission of protecting and restoring Oregon's wildlands, wildlife, and waters as an enduring legacy for future generations. Oregon Wild advocates for Oregon's unique environments through a combination of education, public communications, direct lobbying, grassroots activism, litigation, and partnering with and elevating allied groups and voices. Oregon Wild has over 20,000 members and supporters, and offices in Portland, Eugene, Bend, and Enterprise, Oregon.

14.     Plaintiff **Native Fish Society** is the leading science-based native fish conservation organization in the Pacific Northwest, with over 7,750 members and supporters and 59 River

Stewards and Native Fish Fellows. Guided by the best available science, Native Fish Society advocates for the recovery and protection of wild, native fish and promotes the stewardship of the habitats that sustain them. Native Fish Society and its members have specific interests in the continued health of native Pacific salmon species and their habitats, including in the McKenzie River where Native Fish Society has two River Stewards.

15.     Plaintiffs, and their staff and members, have significant and long-standing interests in the preservation and protection of Upper Willamette River Chinook salmon and bull trout and their habitat. These interests are directly harmed by Defendant's actions and inactions challenged herein. Plaintiffs' staff and members regularly use and enjoy the Willamette River and its tributaries, including the Upper McKenzie River and the area affected by the Carmen-Smith Project. Plaintiffs and their members and staff frequently visit the river to observe, photograph, study, and enjoy salmon and bull trout and to engage in other personal, recreational, and professional activities. Plaintiffs and their members derive recreational, scientific, aesthetic, spiritual, and economic benefits from these pursuits and the existence in the wild of native salmon and bull trout.

16.     For example, one member of Cascadia Wildlands is a photographer and videographer who grew up in McKenzie Bridge and enjoys taking photos and videos of McKenzie River fish near the Project. Another member of Cascadia Wildlands and Native Fish Society owns a fly-fishing shop that caters to McKenzie River anglers. Native Fish Society's McKenzie River Steward is a member who lives near the river and runs Salmon Watch outings at the Carmen-Smith Spawning Channel at the base of Trail Bridge Dam. Additionally, staff of Cascadia Wildlands, Oregon Wild, Willamette Riverkeeper, and Native Fish Society regularly visit the McKenzie for professional and recreational purposes. These members' recreational and aesthetic interests are injured by the failure of EWEB to follow through with its affirmative obligations to install volitional passage. Plaintiffs' staff and members will continue to use the McKenzie River in 2025 and beyond for these purposes, and their use and enjoyment and commercial success will continue to be impaired if the McKenzie River Chinook salmon and

bull trout populations continue to be harmed by the known effects on these species by the Carmen-Smith Project.

17.  Plaintiffs have also been long-time advocates for native salmon and fish, including Upper Willamette River Chinook salmon and bull trout, and have long-standing concerns about the threat to these species from the operation of the Carmen-Smith Project. Plaintiffs have engaged in public outreach and education, advocacy with agencies, agency administrative processes, and litigation to promote the protection of Upper Willamette River Chinook salmon and bull trout. For instance, Native Fish Society is a plaintiff in the lawsuit challenging the operation of the U.S. Army Corps of Engineers' Willamette Project, which resulted in the improvement of fish passage conditions for Upper Willamette Chinook salmon and other fish at numerous dams in the Willamette River basin. Cascadia Wildlands and Oregon Wild have been actively involved in advocacy, education, and litigation over impacts on listed fish in the McKenzie River Watershed since their formation, including in challenging numerous large-scale forestry projects impacting listed fish species and their habitat in this watershed. More specifically, as co-signatories to the 2008 Settlement Agreement for the Project, they have formally engaged with the Project through public commenting, public meetings, and other advocacy since at least 2006. Willamette Riverkeeper has been actively engaged in numerous campaigns to improve fish habitat in the basin as well as to reduce adverse impacts of hatcheries on native wild salmon, including the McKenzie River population of Chinook, and advocating for the health of the McKenzie River, including in recent years engaging with decisionmakers and supporting the proposal to remove Leaburg Dam with Cascadia Wildlands, Oregon Wild, and other conservation partners. During past re-licensing of Leaburg Dam, Oregon Wild advocated for more water in the river and less diverted into the canal at the Dam; Oregon Wild also helped get a second fish ladder at the Dam.

18.  Plaintiffs' interests in protecting and enjoying the McKenzie River populations of Chinook salmon and bull trout are directly harmed by Defendant's actions and inactions. Plaintiffs' above-described interests have been, are being, and unless the relief prayed for is

granted, will continue to be adversely affected and irreparably injured by Defendant's violations of the ESA.

**Defendant**

19.     Defendant **Eugene Water and Electric Board** ("EWEB") is a state-regulated, municipally-owned, non-profit, public utility organized under the laws of the State of Oregon to control and operate water and electric utilities for the City of Eugene. EWEB owns and operates the Carmen-Smith Project. EWEB maintains its headquarters in Lane County with its primary office in Eugene, Oregon.

## LEGAL BACKGROUND

**The Endangered Species Act**

20.     The Endangered Species Act was enacted to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved [and] to provide a program for the conservation of such . . . species." 16 U.S.C. § 1531(b).

21.     FWS or NMFS (the "Services") must list a species as endangered under the ESA if it is in danger of going extinct throughout all or a significant portion of its range, and must list it as threatened if it is likely to become endangered in the foreseeable future. 16 U.S.C. §§ 1532(6), 1532(20), 1533(a)(1). FWS is responsible for consultations involving terrestrial species, such as bull trout, while NMFS is responsible for consultations involving marine species, such as salmon. Once species are listed as threatened or endangered, the Services must designate their critical habitat, which is occupied or unoccupied habitat that contains physical or biological features essential to the conservation of the species and which may require special management considerations or protection. 16 U.S.C. §§ 1532(5), 1533(a)(3).

22.     A federal agency that authorizes, funds, or carries out an activity that may affect a listed species must consult with the appropriate Service about the impacts of that activity to ensure that it does not jeopardize the continued existence of the species or result in the destruction or adverse modification of critical habitat. 16 U.S.C. § 1536(a)(2). Jeopardize

means "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of [the] species in the wild by reducing the reproduction, numbers, or distribution of th[e] species." 50 C.F.R. § 402.02.

23.     During the ESA consultation process, if the action agency concludes in a "biological assessment" that the activity is "not likely to adversely affect" the listed species or adversely modify its critical habitat, and the Service concurs with that conclusion, then the consultation is complete. 50 C.F.R. §§ 402.12, 402.14(b). If, however, the action agency or the Service determine that the activity is "likely to adversely affect" the listed species or its critical habitat, then the Service completes a "biological opinion" to determine whether the activity will jeopardize the species or result in destruction or adverse modification of critical habitat. *Id.* § 402.14. If the Service determines in the biological opinion that the action will jeopardize the species or adversely modify critical habitat, it may propose one or more reasonable and prudent alternative actions that would avoid such results. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(g)(5).

24.     The ESA and its regulations also prohibit "take" of listed species, which is defined broadly to include harassing, harming, wounding, killing, trapping, capturing, or collecting the species. 16 U.S.C. §§ 1538, 1532(19) (prohibiting take of endangered species); 50 C.F.R. § 223.203 (extending take prohibition to threatened West Coast salmon and steelhead); 50 C.F.R. § 17.31(a) (extending take prohibition to threatened wildlife, including bull trout). Harm is further defined to include significant habitat modification or degradation that kills or injures a listed species by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering. 50 C.F.R. § 17.3. Harass is further defined to include acts or omissions that create "the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering." *Id.*

25.     The Services can authorize take of a listed species through an "Incidental Take Statement" that accompanies a biological opinion if the taking is incidental to an otherwise

lawful activity and does not cause jeopardy to the species. 16 U.S.C. § 1536(b)(4); 50 C.F.R.

§ 402.14(i). Any taking that conforms to the terms and conditions within an Incidental Take

Statement is not prohibited under Section 9 of the ESA. 16 U.S.C. § 1536(o)(2); 50 C.F.R.

§ 402.14(i)(6).

26.     Once the consultation is complete, the agencies have a duty to ensure that it

remains valid. Reinitiation of consultation is required and shall be requested by the action agency

if: (a) the amount or extent of taking specified in the incidental take statement is exceeded; (b)

new information reveals effects of the action that may affect listed species or critical habitat in a

manner or to an extent not previously considered; (c) the identified action is subsequently

modified in a manner that causes an effect to the listed species or critical habitat that was not

considered in the biological opinion; or (d) a new species is listed or critical habitat designated

that may be affected by the identified action. 50 C.F.R. §§ 402.16, 402.14(i)(5).

## FACTUAL BACKGROUND

### Upper Willamette River Chinook Salmon

27.     Upper Willamette River Chinook salmon are an evolutionarily significant unit of

anadromous salmonids native to the Upper Willamette River above Willamette Falls. Upper

Willamette River Chinook are listed as threatened under the ESA. They have designated critical

habitat in the Upper Willamette River Basin, including the McKenzie River downstream of Trail

Bridge Reservoir, Trail Bridge Reservoir itself, the Smith bypass reach upstream to just above its

confluence with Trail Bridge Reservoir, and the lower Carmen bypass reach upstream to

Tamolitch falls.

28.     Upper Willamette River Chinook are born in freshwater streams in the Upper

Willamette River Basin and then migrate down the Willamette River and Columbia River to the

ocean, where they live for several years before returning to their natal streams to spawn and

complete their life cycle. This species adapted their migration timing to the Willamette River's

flows to get past Willamette Falls, the second-largest waterfall by volume in the United States.

The falls have historically acted as an intermittent physical barrier to upstream migration into the

Upper Willamette River Basin. Upper Willamette River Chinook begin appearing in the lower Willamette River mid-winter, ascending the falls in the spring when flows are high enough to support their passage. Due to changes in water flows caused by dams, the fish now ascend Willamette Falls through a fish ladder. Adult Chinook ascend over the falls from April through July. Because of their early migration timing and isolation above the Falls, Upper Willamette River Chinook are genetically diverse from other Columbia River salmon species.

29.     Once they successfully navigate the falls, Upper Willamette Chinook quickly migrate to cooler waters in the Upper Willamette River and its tributaries, where they hold in deep pools through the summer. Chinook wait to deposit their eggs at a time that increases the likelihood their fry will emerge the following spring. The timing of spawning varies with water temperature but typically occurs in September and early October. Eggs incubate in gravels until the following spring. Juveniles emigrate to the ocean either as sub-yearlings in the fall or as yearlings in the spring.

30.     The physical and biological features essential to the conservation of Upper Willamette River Chinook include water quality and quantity, spawning gravels and substrate, forage, natural cover including side channels and large wood, unobstructed migration corridors, and floodplain connectivity. When the species was listed as threatened, one of the primary factors contributing to its decline was the loss of historic spawning and rearing habitat due to dam blockages.

31.     Historically, the Upper Willamette River supported hundreds of thousands of Chinook salmon, but the species' abundance has declined dramatically. In recent years, 80–90% of the remaining Upper Willamette River Chinook salmon are hatchery fish. NMFS considers Upper Willamette River Chinook salmon to be at moderate risk of extinction, with five of the seven subpopulations at "high" or "very high" risk of extinction. The McKenzie River subpopulation of Upper Willamette River Chinook salmon is a core and genetic legacy population. Parts of the upper McKenzie River are designated as "Wild & Scenic," in part for the river's fish populations and water quality.

32.     Before the construction of major dams in the Willamette River Basin, the McKenzie River produced about 40 percent of the Upper Willamette River Chinook salmon spawning in the Willamette River Basin upstream of Willamette Falls. However, in 2024, NMFS completed its 5-year status review of Upper Willamette River Chinook and recognized that the McKenzie population remains well below its recovery goal, with nearly half of the spawning population comprised of hatchery-origin fish. Once a stronghold of natural production for the species, the status of the McKenzie River population is important to the entire Upper Willamette River Spring Chinook salmon evolutionarily significant unit.

Bull Trout

33.     Bull trout are a type of char in the salmonid family native to the waters of western North America. Bull trout in the McKenzie River belong to the Columbia River distinct population segment, which has been listed as threatened under the ESA since 1998. They are part of the Upper Willamette core area. Bull trout have critical habitat in the McKenzie River subbasin, including the McKenzie River, Trail Bridge Reservoir, Smith River, Sweetwater Creek, and Carmen-Smith Spawning Channel.

34.     Bull trout require cold water throughout their life cycle. They most commonly spawn in small streams and then migrate to rear in lake, river, or saltwater environments. Bull trout require cold water temperatures (less than 12 degrees Celsius/54 degrees Fahrenheit); clean water and stream substrates; complex stream habitat including deep pools, overhanging banks, and large woody debris; and passage between upstream spawning and rearing areas and downstream foraging and overwintering habitats. Bull trout also migrate between local populations within core areas, which ensures regular interchange of genetic material, thereby promoting genetic variability and aiding in the recovery of the species.

35.     In listing bull trout as threatened, FWS recognized that one of the primary factors contributing to their threatened status was the blockage of migratory corridors by dams or other diversion structures. Specifically, dams "can alter habitats; flow, sediment, and temperature regimes; migration corridors; and interspecific interactions, especially between bull trout and

introduced species …. Impassable dams have caused declines of bull trout primarily by preventing access of migratory fish to spawning and rearing areas in headwaters and precluding recolonization of areas where bull trout have been extirpated." Because bull trout require up- and downstream fish passage to carry out their life history strategies, dams with only upstream volitional fish passage also isolate bull trout if bull trout cannot safely pass downstream.

36.     Bull trout were once widely distributed within the Upper Willamette River Basin, including the McKenzie River, but there are now estimated to be less than 280 adults within just four local populations in this core area. These populations are found in the McKenzie and Middle Fork Willamette subbasins, and have been fragmented by dams into four isolated areas: (1) South Fork McKenzie River above Cougar Dam; (2) Trail Bridge Reservoir above Trail Bridge Dam; (3) fluvial Mainstem McKenzie River; and (4) Middle Fork Willamette River above Hill's Creek Dam. Both the Mainstem McKenzie River and Trail Bridge local populations are impacted by the Carmen-Smith Project. In 2016, Oregon Department of Fish and Wildlife estimated there were only 75 adults in the Mainstem McKenzie population and 86 in the Trail Bridge population; its maximum estimate for the Trail Bridge population is 150 adults/subadults. Bull trout in the Upper Willamette core area are at risk of extinction due to their small population size and physical isolation by dams that prevent gene flow between local populations.

<u>The Carmen-Smith Hydroelectric Project</u>

37.     The Carmen-Smith Hydroelectric Project is located on the McKenzie River, a tributary of the Willamette River in Linn and Lane counties in Oregon's Cascade Range. The Carmen-Smith Project is a series of three dams, three reservoirs, and two powerhouses in the upper reach of the McKenzie River. The Project is owned and operated by EWEB for hydropower production. In 1958, EWEB obtained the initial license for the Project, and in 1963, power production began. The Project consists of two developments: the Carmen Development and the Trail Bridge Development.

38.     The Carmen Development includes the Carmen Dam, Smith Dam, and Carmen Powerhouse. The Carmen Dam is the uppermost dam and diverts some water from the McKenzie River into a tunnel and then into Smith Reservoir; the rest of the river flows down to Trail Bridge Reservoir. Water in the Smith Reservoir goes either through a tunnel and power turbines at Carmen Powerhouse, and then is discharged back into the McKenzie River at the head of Trail Bridge Reservoir, or flows through the Smith bypass channel directly into Trail Bridge Reservoir. The Carmen Powerhouse operates as a peaking facility, which means it produces power at different levels throughout the day depending on need, creating highly fluctuating water levels below the powerhouse



39.     The Trail Bridge Development includes the roughly 100-foot-high Trail Bridge Dam; Trail Bridge Reservoir; and the Trail Bridge Powerhouse. The Trail Bridge Dam is the lowermost dam and releases water from Trail Bridge Reservoir into the McKenzie River through one power turbine or via a spillway. The Trail Bridge Development operates to minimize water flow

Figure 1.  Location and project facilities of the Carmen-Smith Hydroelectric Project (Source:  EWEB, 2006, as modified by staff).

fluctuations below the dam and produces a small amount of power that varies with river flows. Just below Trail Bridge Dam and Powerhouse is the Carmen-Smith Spawning Channel that was constructed based on an agreement between EWEB and state fish and wildlife agencies to provide spawning habitat for returning Chinook salmon and bull trout as mitigation for the loss of habitat above the Project dams.

Impacts of Trail Bridge Dam on Upper Willamette River Chinook Salmon and Bull Trout

40.    Maintaining and operating the Carmen-Smith Project negatively affects habitat conditions, behavioral patterns, and life cycles of migratory fish, including threatened Upper Willamette River Chinook salmon and bull trout.

41.    The primary impact of the Project is the lack of safe up- and downstream fish passage, which blocks access to important habitat and inhibits fish migration. As the lowermost dam in the Project, the Trail Bridge Dam is an absolute barrier to Upper Willamette River Chinook and bull trout.

42.    Access to all Upper Willamette River Chinook critical habitat upstream of the Trail Bridge Dam—approximately 8 miles of habitat—is completely impeded by the dam. This inaccessible habitat provides some of the highest quality spawning grounds in the McKenzie watershed due to cold temperatures, good water quality, and relatively pristine habitat conditions. This spawning habitat will become increasingly important as climate change causes warmer water temperatures in downriver spawning and rearing areas. The lack of safe connections to and from high-quality habitat hinders Upper Willamette River Chinook's chance at recovery and "climate change modeling predicts that in the absence of passage to colder headwater areas, some populations would be at a high risk of extinction by 2040."

43.     Trail Bridge Dam also isolates the small Trail Bridge local population of bull trout above the dam and prevents migration downriver, thereby inhibiting life history strategies and preventing interbreeding between up- and downstream populations. Bull trout require connected, complex habitats with unobstructed migratory pathways linking upstream spawning and rearing areas with downstream foraging areas and overwintering habitats. Additionally, habitat connectivity is essential for the conservation of bull trout because it enables different local populations to interbreed, which improves genetic diversity and population viability. Isolation of small local populations puts them at higher risk of extinction, and climate change exacerbates these impacts. Habitat connectivity also allows bull trout to re-establish in areas where their populations were previously extirpated increasing their resilience to biological stressors.

44.     Some attempts have been made to catch adult Chinook and bull trout below Trail Bridge dam and transport them upriver to allow them to spawn in and access the higher-quality habitat. However, injury, mortality, harm, and harassment of adults have occurred during these trap-and-haul efforts.

45.     In addition, a tailrace barrier tries to direct adult fish into the spawning channel below Trail Bridge Dam, but some fish get past the barrier and end up at the base of the dam. These fish can be injured or killed if they are attracted to the turbine discharge or try to use draft tubes as cover.

46.     Adult and juvenile fish can also be injured or killed at the upper end of the spawning channel if they are entrained between the channel headgate (upstream exit) and diffuser.

47.    For adults that are transported above Trail Bridge Dam, upstream passage is also limited by the Carmen Power Plant tailrace located at the head of Trail Bridge Reservoir, which can cause delay, injury, and mortality during attempted upstream migration. Some adult Chinook and bull trout in the reservoir fall back through the dam's spillway and end up at the base of the dam.

48.    When adults are able to spawn above Trail Bridge Dam, juveniles migrating downriver must pass through Trail Bridge Reservoir and Dam. Mortality can occur in the reservoir if juveniles are eaten by predators or are stranded on the banks due to water level fluctuations within EWEB's control. Juveniles also incur injuries or mortality when passing through the dam. Fish can only pass through the power turbine, spillway, or a specific valve outlet near the base of the dam.

49.    The valve is a Howell-Bunger valve, which is a specific type of outlet near the base of the dam that is infrequently used to drain the reservoir or to pass water when the turbines and spillway cannot be operated. Juvenile fish mortality through the Trail Bridge turbine is estimated to be >10% and likely higher at the valve. As fish size increases, mortality rates through turbines increase.

50.    Fish are more likely to pass over the spillway than through the turbine, but the current spillway was not designed to safely pass fish. Spillway passage mortality ranges from 0 to 15%. Fish that do survive passage incur injuries from striking the turbine blades or the sides of the spillway gate. EWEB has estimated that 200 Chinook salmon fry and juveniles are killed, injured, or stressed each year by passage through the spillway. For larger adult bull trout trying to migrate downriver, injuries and mortality are even more certain. When the spillway is shut off, adult and juvenile fish can be trapped in a small pool above the base of the spillway.

Additionally, spillway operations can cause injury and mortality to juveniles from exposure to excessive total dissolved gas.

51.     The Project also affects habitat conditions for these fish. In addition to reducing the amount of high-quality river habitat by creating reservoirs and altering natural water flows in the bypassed diversion reaches, the Project also blocks important habitat features—such as large woody debris and spawning gravels—from moving downriver.

<u>2008 FERC Relicensing Process, 2008 Settlement Agreement, and 2009 Environmental Assessment</u>

52.     In November 2006, EWEB filed an application to renew its 50-year license for the Carmen-Smith Project, which was set to expire in November 2008. In 2007, FERC issued public notice of the relicensing process. Numerous parties engaged in the relicensing process, and in 2008, EWEB entered into a relicensing settlement agreement ("2008 Settlement Agreement") with state and federal wildlife agencies, FERC, tribes, and conservation organizations, including Plaintiffs Cascadia Wildlands and Oregon Wild. In light of this agreement, EWEB supplemented its relicensing application.

53.     The 2008 Settlement Agreement set forth EWEB's proposed environmental protection, mitigation, and enhancement measures that would be incorporated into any new license for the Project. These measures included the installation of volitional up- and downstream fish passage at Trail Bridge Dam (Articles 29–32, 35) in order to minimize injuries and mortalities to Upper Willamette River Chinook and bull trout from operation of the Carmen-Smith Project. Specifically, these measures required EWEB to take the following actions within six years of license issuance:

   a.  **Article 30** required EWEB to design, construct, operate, and maintain a volitional fish ladder to provide upstream passage over Trail Bridge Dam;

b. **Article 31** required EWEB to design, construct, operate, and maintain a tailrace velocity barrier to block fish from entering the tailrace at Trail Bridge Dam for fish passage;

c. **Article 32** required EWEB to design, construct, operate, and maintain a NMFS criteria fish screen and bypass system for downstream fish passage past Trail Bridge Dam; and

d. **Article 35** required EWEB to design, construct, operate, and maintain a fish passage facility at the entrance to and the upstream end of the Carmen-Smith Spawning Channel for fish passage to and through the spawning channel.

54. In 2009, FERC issued an environmental assessment ("EA") for the relicensing that evaluated the potential natural resource benefits, environmental impacts, and economic costs associated with the relicensing. The EA recommended licensing the Project as proposed by EWEB and the 2008 Settlement Agreement, with a few minor modifications by FERC staff. FERC concluded, "[t]hese environmental measures would be worth the cost because they would benefit various fish species and aid in the recovery of threatened Upper Willamette River Chinook salmon and bull trout." Overall, FERC determined that "relicensing the project would result in cumulative beneficial effects on migratory fish species" due to the implementation of volitional passage, increased stream flows in bypassed reaches, and habitat improvement measures.

<u>2010 and 2011 Biological Opinions</u>

55. Subsequently, in compliance with the ESA, both expert fish agencies issued biological opinions analyzing the impacts of the proposed relicensing of the Carmen-Smith Project on listed fish, including the conservation measures in the 2008 Settlement Agreement.

56. FWS's 2010 Biological Opinion concluded the relicensing would not jeopardize the continued existence of bull trout or adversely modify bull trout critical habitat. NMFS's 2011 Biological Opinion concluded the same as to Upper Willamette River Chinook salmon. Although both agencies recognized the harm the Project posed to the listed fish, they concluded that

EWEB's implementation of the conservation measures—*i.e.,* volitional fish passage at Trail Bridge Dam—would largely improve aquatic conditions for the species and significantly reduce the adverse impacts to them and their critical habitat over the term of the license.

57.     FWS's opinion discussed how an upstream fish ladder at Trail Bridge Dam would allow adult bull trout to return to natal spawning and rearing areas above Trail Bridge Dam, which in turn would increase bull trout population abundance, health, and resiliency to disturbance. The construction of the new tailrace barrier at the dam would help guide upstream migrants and prevent injury and mortality at the Tail Bridge Power Plant tailrace. EWEB's construction of downstream fish passage would also allow the isolated bull trout population upstream of the dam to safely migrate downriver. The proposed improvements to fish passage at the Carmen-Smith Spawning Channel would also benefit bull trout by increasing habitat availability and complexity. Moreover, because Chinook salmon and other native fish are part of bull trout's prey base, benefits to these other species would also benefit bull trout.

58.     NMFS's opinion also espoused the many benefits of the proposed up- and downstream fish passage facilities. The upstream volitional fish passage facility at Trail Bridge Dam "would enable Chinook salmon to access historical spawning and rearing habitat" above the dam, and the associated tailrace barrier "would guide upstream migrants towards the Trail Bridge fish passage entrance and prevent upstream migrants from approaching the Trail Bridge Power Plant discharge, reducing the potential for delay, injury, or mortality at the Trail Bridge Power Plant tailrace."

59.     The measures to provide downstream passage at Trail Bridge Dam would similarly benefit Chinook. NMFS concluded that the number of juvenile Chinook at risk of mortality, injury, or stress from passage over the Trail Bridge spillway "is likely to be significantly reduced by the provision of an alternative downstream passage route," which "would increase Chinook smolt production from the Action Area by over 20% as a result of decreased mortality of outmigrating smolts." It would also reduce the residence time of fry and juveniles in the reservoir, lowering their exposure to predation and stranding risk associated with

water fluctuations. Overall, it would increase the survival of juvenile and fry stages, "increasing the abundance and productivity of the McKenzie Chinook population." NFMS noted that "[u]ntil fish passage facilities are built … [Trail Bridge Dam] will continue as a barrier to upstream and downstream fish passage, affecting survival of fry, juvenile and adult Chinook salmon" and will likely "reduce the abundance, productivity, and spatial structure of the McKenzie Chinook population."

60.    Both FWS and NMFS issued Incidental Take Statements for the Project on the condition that EWEB would fully implement the conservation measures from the 2008 Settlement Agreement, including constructing fish passage facilities at Trail Bridge Dam and Carmen-Smith Spawning Channel, within six years. FWS's Incidental Take Statement provided for take of **1747** bull trout—an average of **292** per year—in the interim period until the fish passage facilities are constructed based on the estimated number of bull trout that would be harmed, injured, or killed due to unsafe downstream passage conditions. It further estimated that **7** bull trout would be injured or killed each year via temporary upstream trap-and-haul. NMFS's Incidental Take Statement provided for an annual take of **4,000** Chinook salmon fry and juveniles from downstream passage during the interim period until volitional fish passage construction.

<u>2016 Economic Viability Analysis and 2016 Revised Settlement Agreement</u>

61.    On July 27, 2015, EWEB requested that FERC delay issuance of the new Project license to allow EWEB to complete an updated economic analysis. On January 29, 2016, EWEB completed its economic viability analysis, which concluded that volitional passage requirements made the Project uneconomical. EWEB requested time to attempt to amend the license and restructure the settlement agreement to draft an economic solution to fish passage, specifically proposing to:

    a.  Provide for upstream fish passage at Trail Bridge Dam by

        i.  Within three years of the license issuance, installing a new trap-and-haul system at Trail Bridge Dam (instead of a volitional fish ladder);

> > ii. Removing the existing tailrace barrier downstream of Trail Bridge Dam to provide access to the new trap-and-haul system;
>
> b. Provide for downstream fish passage at Trail Bridge Dam by
>
> > i. Within three years of the license issuance, modifying the Trail Bridge Dam spillway, gate and hoist system;
> >
> > ii. Ceasing generation at the Trail Bridge Power Plant to pass fish downstream of Trail Bridge Dam through the spillway instead of screening the Power Plant intake; and
>
> c. Within four years of the license issuance, improve fish passage at the Carmen-Smith Spawning Channel.

62.     EWEB also proposed interim measures for the period before the new fish passage facilities are completed, notably: to fund Oregon Department of Fish and Wildlife's implementation of trap-and-haul for upstream bull trout passage at Trail Bridge Dam; and to implement water flows to help downstream passage at Trail Bridge Dam. Because there was no facility to collect fish below the dam, the State's method consisted of using hook-and-line to manually capture the fish, which FWS estimated would injure or kill up to 15% of the fish. Conversely, the newest collection facilities for trap-and-haul attract fish with high water flow, collect and hold them, and transport them into a truck to be hauled upriver without the fish ever leaving water and with minimal handling by humans.

63.     These changes to the 2008 Settlement Agreement resulted in a new 2016 Settlement Agreement that incorporated EWEB's new proposals for fish passage. NMFS and FWS rejoined the agreement despite their opinion that "trap-and-haul systems are typically less effective than volitional passage, often significantly less so," because of EWEB's agreement to

an expedited timeline of three years from the license issuance date for its completion of the fish

passage systems. Indeed, FWS noted that this "narrow timeline was *the only* significant change

that was more beneficial to ESA-listed fish" in the 2016 Settlement Agreement (emphasis

added). Cascadia Wildlands and Oregon Wild did not agree with the revised approach and thus

did not rejoin the Settlement Agreement.

    2018 Biological Opinions

    64.    In light of the 2016 Settlement Agreement, in 2018, FWS and NMFS issued

revised Biological Opinions again assessing the effects of relicensing the Carmen-Smith Project.

    65.    FWS's 2018 Biological Opinion concluded the relicensing would not jeopardize

the continued existence of bull trout or adversely modify bull trout critical habitat. NMFS's 2018

Biological Opinion concluded the same as to Upper Willamette River Chinook salmon. Both

agencies' opinions were again explicitly conditioned on EWEB's implementation of the now

revised conservation measures contained in the 2016 Settlement Agreement, including EWEB's

new proposal to construct a trap-and-haul facility for upstream fish passage and spillway

modifications for downstream passage at Trail Bridge Dam within three years of license

issuance. The agencies concluded these measures and the expedited timeline would reduce the

Project's otherwise adverse impacts on listed species.

    66.    FWS's 2018 Biological Opinion reiterated how the lack of effective up- and

downstream passage at Trail Bridge Dam impairs bull trout migration in the McKenzie River and

connectivity with other local bull trout populations. However, it found that EWEB's proposed

conservation measures would "significantly reduce" ongoing and future Project impacts,

providing long-term benefits and contributing to the survival and recovery of bull trout. FWS

determined the proposed passage facilities would reduce the Project's impacts to bull trout

relative to the current conditions at Trail Bridge Dam. The new facilities would "increase bull trout population abundance, health, and resiliency to disturbance by allowing access to natal spawning sites, increased genetic connectivity, the expression of multiple life histories, and the opportunity to migrate downstream with prey migrations without being lost to the population upstream of Trail Bridge dam."

67.    However, FWS's 2018 Biological Opinion also noted the negative effects from trap-and-haul that constitute harming, wounding, killing, harassing, trapping and collecting under the ESA, including "physical injury or death due to mechanical malfunction with the equipment; physiological stress during capture, holding, or release; predation and cannibalism during holding and/or transport; migration delay due to potential hesitation to enter the trapping facility; and potential horizontal transmission of disease and pathogens and stress related phenomena during holding and/or transport." For downstream passage, the proposed spillway modifications would "provide bull trout of all ages a safer and more accessible downstream passage route than is currently available," which FWS determined should increase bull trout populations both up- and downstream of Trail Bridge Dam. FWS found that only with completion of the spillway modifications would there be "little injury or mortality to bull trout associated with downstream passage." Fish passage benefits to Chinook would also benefit bull trout.

68.    NMFS's 2018 Biological Opinion also reiterated the harm to Upper Willamette River Chinook salmon from Trail Bridge Dam. NMFS determined that in the interim period until new passage facilities are built, harm to Chinook salmon would continue to occur. For instance, "[a]dult fish will continue to pass the existing Trail Bridge tailrace velocity barrier and some would likely be injured or killed by entering the Trail Bridge powerhouse tailrace"; lack of

access to upstream spawning habitat "limits abundance and productivity by forcing spawners to compete for the available downstream habitat"; and some 4,000 Chinook fry and juveniles will be killed or injured annually attempting to migrate through the existing turbines or spillway. It concluded that "[u]ntil the new passage facilities are in operation (within three years of the new license issuance), the ongoing condition at Trail Bridge Dam would be likely to reduce the abundance, productivity, and spatial structure of the McKenzie Chinook population." Once new up- and downstream fish passage measures are completed, however, these adverse impacts would be minimized.

69.     Both FWS and NMFS issued new Incidental Take Statements for the Project, which determined the Project was expected to "take" bull trout and Upper Willamette River Chinook, particularly in the interim period before fish passage measures are completed. Both Incidental Take Statements required that all EWEB's proposed conservation measures would occur in the expedited timeframe set out in the 2016 Settlement Agreement, including completion of up- and downstream fish passage at Trail Bridge Dam within three years of the license issuance.

70.     FWS's Incidental Take Statement provided for take of **616** bull trout annually during the interim period due to unsafe downstream passage conditions through the spillway or turbines before completion of fish passage facilities. Once spillway modifications are completed, FWS predicted annual take of no more than **354** bull trout annually (no more than 2% mortality and 5% injury). For temporary capture and transport of adult bull trout from below Trail Bridge Dam to the Reservoir, it provided for **15%** take of the total handled for all years prior to license issuance and no more than 3 years post-license issuance. For temporary capture and transport from Trail Bridge Reservoir to Sweetwater Creek, it provided for **15%** take of the total handled

for up to 1 year post license. After completion of the Trail Bridge trap-and-haul facility, FWS predicted an annual take of only **2** adult fish or **1%** mortality and **5%** injury.

71.    NMFS's Incidental Take Statement predicted an annual take of **2%** mortality and **5%** injury of Chinook fry and juveniles once spillway modifications are completed, and **<1%** mortality of adults once upstream trap-and-haul is completed. Before new passage facilities are built, NMFS estimated the extent of take as the amount that will occur under the interim flow operations. NMFS stated specifically that the incidental take exempted by the Incidental Take Statement "would be exceeded if [EWEB] fails to carry out the proposed action in strict accordance with the [2016 Settlement Agreement]," and included a mandatory Term and Condition that ordered EWEB to "[f]ollow all of the [2016 Settlement Agreement] provisions that relate to Chinook salmon (including, but not limited to fish passage . . .) for this Project."

        2019 FERC License

72.    On May 17, 2019, FERC granted EWEB a new 50-year license to allow EWEB's continued operation of the Carmen-Smith Project. The new license incorporated the 2016 Settlement Agreement and included 34 license articles, including three articles specific to fish passage:

> a.    **Article 29** requires by May 2022, EWEB to construct a trap-and-haul fish passage facility at Trail Bridge Dam to provide upstream passage, and to remove the existing tailrace barrier below the dam to allow access to the trap-and-haul facility. It also requires hydraulic and biological monitoring to ensure the facility is functioning as required.
>
> b.    **Article 30** requires by May 2023, EWEB to construct an upstream fish ladder with steps no higher than six inches at the entrance to the Carmen-Smith

Spawning Channel and to modify the upstream end of the channel to provide passage back to the McKenzie River. It also requires EWEB to develop an operations and maintenance plan to ensure the facilities continue to operate as intended.

c. **Article 33** requires by May 2022, EWEB to design, construct, operate, and maintain the Trail Bridge Dam spillway, gate hoist system, and attraction water supply for downstream fish passage at Trail Bridge Dam. It also requires monitoring to ensure the system is functioning as designed. Once the downstream passage is operational, EWEB is required to cease operating the Trail Bridge Powerhouse for power generation to facilitate fish passage and avoid entrainment, and thereafter only operate the Powerhouse for safety, maintenance, or emergency situations.

73.     The license also included an adaptive management provision requiring the construction of a volitional fish ladder if, after ten migration seasons, the trap-and-haul system proved inadequate.

74.     The fish passage articles were incorporated into the license based on the 2016 Settlement Agreement but were also required under other laws applicable to EWEB's operation of the Carmen-Smith Project, including: Oregon Department of Environmental Quality's water quality certification under Section 401(a)(1) of the Clean Water Act, 33 U.S.C. § 1341(a)(1); the Forest Service's terms and conditions under Section 4(e) of the Federal Power Act, 16 U.S.C. § 797(e); NMFS's prescriptions for fishways under Section 18 of the Federal Power Act, 16 U.S.C. § 811; NMFS's terms and conditions under Section 305(b)(2) of the Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. § 1855(b)(2); and the terms and

conditions in NMFS's and FWS's 2018 Incidental Take Statements under Section 9 of the ESA, 16 U.S.C. § 1538.

### EWEB's Failure to Implement the Fish Passage Measures Required by the 2019 License and 2018 Biological Opinions

75.    On May 18, 2020—not even one year into the new license—EWEB informed FERC that it expected delays in completing the requisite fish passage facilities and submitted a new timeline for their design and construction, which FWS, NMFS, and FERC disapproved. For the next two years, EWEB requested further extensions and was ultimately required to participate in a FERC dispute resolution process. On May 16, 2022—the year that fish passage construction was supposed to be completed—EWEB filed a self-report of non-compliance. EWEB had not even started construction of the trap-and haul-facility, and identified new completion dates of December 2027, for completing the upstream trap-and-haul facility (Article 29), and December 2029, for completing the spillway modification actions (Article 33). EWEB blamed its delay on purported dam safety issues, primarily, sinkholes in Trail Bridge Reservoir. On May 16, 2023—four years after license issuance and the year upstream passage at Carmen-Smith Spawning Channel was supposed to be completed—EWEB filed an extension of time request to fulfill its obligations under license Article 30 until August 15, 2029, which was necessary because of its delays with Articles 29 and 33.

76.    On October 18, 2023, and October 27, 2023, NMFS and FWS filed letters with FERC alleging EWEB's non-compliance with its license. NMFS and FWS were emphatic: EWEB's "lack of progress toward completion of the Project's required fish passage measures is unacceptable." The letters detailed EWEB's pattern and practice of delaying progress "at every turn" and noted their "observations of bad faith behavior." NMFS's letter included a declaration from a former EWEB hydropower compliance staff member who made allegations about

EWEB's behavior such as that EWEB never intended to meet the three-year deadline for fish

passage, made false statements about the reasons for the delay, and overall was acting in bad

faith. The agencies agreed that EWEB's actions "have led to significant harm to ESA-listed fish

and the economic justification for those changes have proven false." They accordingly requested

that FERC require EWEB to construct fish passage facilities immediately, and specifically, that

volitional fish passage as was originally planned in the 2008 Settlement Agreement be completed

"on the fastest possible timeline."

77.     On October 24 and November 13, 2023, EWEB responded to NMFS and FWS's

letters denying all allegations that EWEB deliberately delayed construction of fish passage

facilities or falsified information.

78.     In late 2023 and early 2024, NMFS and FWS each filed letters with FERC stating

that due to EWEB's continued delays in implementing conservation measures under the Project

license, particularly regarding fish passage, EWEB could no longer rely on the 2018 Biological

Opinions without reinitiating ESA Section 7 consultation. NMFS stated, "EWEB's actions in

delaying implementation of numerous mitigating measures will alter the impacts to [Upper

Willamette River] Chinook salmon for an indefinite period of time." FWS noted EWEB's

"multiple delays in the implementation of numerous mitigating measures alters the impacts to

bull trout for an indefinite period of time." For the same reasons, in January 2024, NMFS and

FWS each notified FERC that they were exercising their right to withdraw from the 2016

Settlement Agreement.

79.     On April 11, 2024, FERC issued a non-compliance order determining that EWEB

is out of compliance with the fish passage articles of its license (Articles 29, 30, and 33). As to

Articles 29 and 33, FERC noted "a perceived lack of regard to expedite construction and

implementation schedules of these measures" and found EWEB's continued delay went "beyond solely dam safety measures." It also warned EWEB of the potential applicability of the enforcement and penalty provisions of Section 31 of the Federal Power Act due to its lack of compliance with its license. It further required EWEB to continue to file quarterly progress reports. As to Article 30, FERC denied EWEB's request for an extension of time of five years given the delays under Articles 29 and 33 and the fish agencies' feedback. Instead, FERC approved an extension of two years, until May 17, 2025.

80.     On November 1, 2024, EWEB filed a status report as to its compliance with fish passage Articles 29 and 33. EWEB still had not begun construction for any passage components, and its report did not contain any estimate of when fish passage facilities would be completed.

<u>Ongoing Harm, Injury, and Mortality from EWEB's Failure to Implement Effective Fish Passage at Trail Bridge Dam</u>

81.     As detailed above, EWEB has not completed, nor even begun constructing, the up- and downstream passage measures at Trail Bridge Dam required by its FERC license, the 2018 Biological Opinions, and other applicable laws. Because of this, upper Willamette River Chinook have continued to lack safe passage to and from approximately 8 miles of high-quality spawning habitat upriver from Trail Bridge Dam, and bull trout have been isolated and prevented from migrating downriver from the dam.

82.     Specifically, blocking Upper Willamette River Chinook adult and juvenile passage to and from spawning habitat is impairing Chinook essential behavioral patterns and leading to harm, injury, and mortality of fish. EWEB's ongoing operation of Trail Bridge Dam without fish passage significantly impedes adult Chinook from accessing essential spawning habitat and injures and kills juveniles attempting to migrate downriver through the Dam. Its

operations also subject juvenile Chinook to mortality through predation in the reservoir and stranding along the reservoir banks.

83.    The lack of new fish passage facilities at Trail Bridge Dam has similarly harmed, injured, and killed bull trout, and continues to do so. The lack of effective passage for bull trout will continue to impair essential behaviors such as feeding, breeding, sheltering, and migrating. It significantly impairs migration downriver to access foraging or overwintering habitat, or to reach other local populations of bull trout to interbreed, thus decreasing the genetic diversity of the local populations and the viability of the McKenzie River population as a whole. The lack of effective passage also impedes other downstream bull trout populations from using the spawning habitat above Trail Bridge Dam. Any fish that do attempt to migrate past the Dam are subject to a high risk of injury and death. These impacts to both species will continue to result in harm, injury, and mortality until the new passage facilities are built.

84.    EWEB's minimal and largely unsuccessful efforts to trap adult Upper Willamette River Chinook salmon and bull trout for transport above the dam or otherwise mitigate interim impacts have also resulted in consistent harm, harassment, injury and mortality to the fish over the last few years, and these instances of take are not protected by the Incidental Take Statements.

85.    For instance, in 2022, one Chinook mortality occurred during EWEB and Oregon Department of Fish and Wildlife's adult trap-and-haul efforts.

86.    In 2023, two bull trout mortalities occurred in the temporary trap-and-haul construction area in the Carmen-Smith Spawning Channel.

87.    On September 11, 2024, one male salmon was found killed in the spawning channel from predation by a river otter.

88.     In both 2023 and 2024, wildfires and other factors curtailed efforts to capture adult Chinook below the dam and no fish were moved above the dam via the temporary trap-and-haul.

89.     Even when fish are successfully captured, handled, and transported above the river, they experience physiological stress and potential physical injury that can reduce their fitness and reproductive success and may lead to pre-spawn mortality.

90.     In addition, some Upper Willamette River Chinook salmon and bull trout adults released into Trail Bridge Reservoir fall back through the spillway and end up below the dam. Juveniles migrating downriver must still pass through the turbine or a spillway that is not safe for fish, causing injuries and mortalities to many juveniles.

91.     EWEB's temporary efforts to trap, collect, and haul fish have caused and will continue to cause harm, harassment, injury, and mortality to Upper Willamette River Chinook salmon and bull trout, and have otherwise been ineffective in aiding migration.

92.     Because EWEB has violated its obligation to timely complete fish passage facilities and other fish protection measures, it has exceeded the level of authorized take and is no longer in compliance with its Incidental Take Statements. It also continues to press on with its long-term trap-and-haul plans, despite repeated issues and failures, as well as a lack of support from FWS, NMFS, FERC, and the conservation community, including Plaintiffs here. Accordingly, EWEB is liable for the continuing harm, harassment, injury, mortality, trapping, and collection of Upper Willamette River Chinook salmon and bull trout caused by the ongoing operation and maintenance of Trail Bridge Dam.

/

/

## CLAIM FOR RELIEF
### ESA Section 9 "Take" Violation

93.    Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1 through 92, inclusive.

94.    EWEB is in violation of ESA's Section 9 "take" prohibition by contributing to unlawful "take" of Upper Willamette River Chinook salmon and bull trout because the operation of the Carmen-Smith Project continues to harass, harm, wound, kill, trap, capture, and collect the fish due to inadequate fish passage.

95.    By failing to complete fish passage measures at Trail Bridge Dam by May 2022, EWEB is violating the terms and conditions of NMFS's and FWS's 2018 Incidental Take Statements and has exceeded the level of take authorized by the Incidental Take Statements. NMFS and FWS have acknowledged this lack of compliance and stated that EWEB can no longer rely on the 2018 Biological Opinions to cover its actions at the Carmen-Smith Project. Accordingly, EWEB is liable for "take" under ESA Section 9 caused by the Carmen-Smith Project.

96.    EWEB's failure to implement effective fish passage measures at Trail Bridge Dam has and will continue to cause "take" of Upper Willamette River Chinook salmon and bull trout. As explained above, unlawful harm, harassment, injury, mortality, trapping, and collection of these species is occurring in numerous ways, including but not limited to the following:

    a.    Significantly impairing essential behaviors by blocking upriver and downriver migration due to lack of safe adult and juvenile fish passage;

    b.    Unauthorized trapping and collection of individuals for transport above Trail Bridge Dam;

      c.   Harassment, harm, injury, and mortality related to problems with temporary trap-and-haul measures;

      d.   Harm, injury, and mortality from a deficient Trail Bridge Powerhouse tailrace barrier;

      e.   Harm, injury, and mortality when fish attempt to migrate downstream through the Trail Bridge Dam turbines or spillway;

      f.   Harm, injury, and mortality due to stranding of individuals in Trail Bridge Reservoir;

      g.   Harm, injury, and mortality from exposure to increased predation in Trail Bridge Reservoir and the Carmen-Smith Spawning Channel; and

      h.   Harm, injury, and mortality due to exposure to excessive total dissolved gas from the spillway and Powerhouse operations.

97. Additionally, EWEB admitted that between 2022 and 2024, its actions caused mortality of at least two Upper Willamette River Chinook salmon and two bull trout.

98. By causing or contributing to take of Upper Willamette River Chinook salmon and bull trout that is not authorized by NMFS or FWS, EWEB is violating ESA Section 9. EWEB's violation of ESA Section 9, 16 U.S.C. § 1538, is actionable pursuant to the ESA's citizen suit provision, *id.* § 1540(g).

**PRAYER FOR RELIEF**

Plaintiffs respectfully pray that this Court grant the following relief:

A. Adjudge and declare that EWEB is violating its duty under ESA Section 9 to avoid "take" of Upper Willamette River Chinook salmon and bull trout by continuing to fund, operate, and maintain the Carmen-Smith Project in a manner that causes or contributes to harm,

harassment, injury, mortality, trapping, and collection of these species without legal authorization for that take;

B.     Order EWEB to complete volitional fish passage at Trail Bridge Dam as quickly as is reasonably possible, or alternatively, to facilitate processes to decommission and remove Trail Bridge Dam to prevent further harm to Upper Willamette River Chinook salmon and bull trout;

C.     Until the time that volitional fish passage at Trail Bridge Dam is completed or the Dam is decommissioned and removed, order EWEB to take immediate and substantial measures to reduce take of Upper Willamette River Chinook salmon and bull trout;

D.     Order such temporary, preliminary, and/or permanent injunctive relief as may be prayed for hereafter by Plaintiffs to remedy Defendant's violation of law;

E.     Award Plaintiffs their reasonable costs, litigation expenses, expert witness fees and costs, and attorneys' fees associated with this litigation pursuant to the ESA, 16 U.S.C. § 1540(g).

F.     Grant such further and additional relief as the Court deems just and proper in order to remedy the violations of law alleged herein and to protect the interests of Plaintiffs and the public.


Dated: March 17, 2025                    Respectfully submitted,


                                         */s/ Hannah A. Goldblatt*
                                         Hannah A. Goldblatt (OSB # 205324)
                                         Lauren M. Rule (OSB # 105174)
                                         Andrew R. Missel (OSB # 181793)
                                         ADVOCATES FOR THE WEST
                                         3701 SE Milwaukie Ave., Ste. B
                                         Portland, OR 97202

(503) 914-6388
lrule@advocateswest.org
hgoldblatt@advocateswest.org
amissel@advocateswest.org

Daniel C. Snyder (OSB # 105127)
Haley Nicholson (OSB # 224615)
PUBLIC JUSTICE
620 L Street NW, Ste 630
Washington, DC 20036
(202) 797-8600
dsnyder@publicjustice.net
hnicholson@publicjustice.net

Peter D. Jensen III (OSB # 235260)
CASCADIA WILDLANDS
120 Shelton McMurphy Blvd., Ste. 250
Eugene, Oregon 97440
(541) 434-1463
peter@cascwild.org

Lindsey Hutchison (OSB # 214690)
WILLAMETTE RIVERKEEPER
454 Willamette Street, #218
Eugene, Oregon 97401
(831) 818-4129
lindsey@willametteriverkeeper.org

*Attorneys for Plaintiffs*